

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.

CASE NO. 8:22-cv-245-SDM-AAS
18 U.S.C. § 1349

RENITA BROWN, M.D.

## INFORMATION

The United States Attorney charges:

### COUNT ONE
(Conspiracy to Commit Health Care Fraud)

#### A. Introduction

At all times material to this Information:

<u>The Conspirators and Their Enterprises</u>

1. Renita Brown, a resident of the Northern District of Alabama, was a licensed physician in the state of Alabama, Georgia, and Mississippi, who was enrolled in the Medicare program.

2. Willie McNeal IV ("McNeal") was a resident of the Middle District of Florida and owner, president, founder, chief executive officer, and the registered agent of Integrated Support Plus, Inc. ("Integrated").

3. Integrated was a purported telemedicine company located in Hernando County in the Middle District of Florida.

4. Creaghan Harry ("Harry") was a resident of the Southern District of Florida and owner and operator of Telemed Health Group, LLC dba AffordADoc ("AffordADoc").

5. Lester Stockett ("Stockett) was a resident of the country of Colombia and an owner and operator of AffordADoc.

6. AffordADoc was a Delaware corporation and purported telemedicine company, with its principal office in Boca Raton, Florida.

The Medicare Program

7. The Medicare Program ("Medicare") was a federal health insurance program that provided medical benefits, items, and services to beneficiaries:

   a. aged 65 and older,

   b. under 65 with certain disabilities, and

   c. of all ages with end-stage renal disease (permanent kidney failure requiring dialysis or a kidney transplant).

8. The Centers for Medicare and Medicaid Services ("CMS") was an agency of the U.S. Department of Health and Human Service ("DHHS"), and was the federal government body responsible for the administration of Medicare.

9. Medicare programs covered different types of benefits were separated into different program parts. Medicare Part B covered, among other things, doctors' services, outpatient care, and certain medical equipment that were medically necessary.

DME Claims Submitted under Medicare Part B

10. Durable medical equipment ("DME") were reusable medical equipment such as orthotic devices, walkers, canes, or hospital beds. Orthotic devices were a type of DME that included knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces").

11. In order for Medicare to pay for DME, it must have been ordered by a physician or other eligible professional who, among other requirements, was enrolled in Medicare or validly opted-out of the Medicare program. 42 C.F.R. § 424.507(a)(iii).

12. For any DME item to be covered by Medicare, it must be eligible for a defined Medicare benefit category, be reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, and meet all other applicable Medicare statutory and regulatory requirements.

13. For certain DME products, Medicare promulgated specific requirements that a DME order must meet for an order to be considered "reasonable and necessary."

14. DME companies, physicians, and other healthcare providers that provided services to Medicare beneficiaries were referred to as Medicare providers. To participate in Medicare, providers were required to submit an application in which the providers agreed to comply with all Medicare-related laws, rules, and regulations. If Medicare approved a provider's application, Medicare assigned the provider a Medicare "provider number." A healthcare provider with a Medicare provider number could file claims with Medicare to obtain reimbursement for medically

necessary items and services rendered to beneficiaries. Medicare providers were given access to Medicare manuals and service bulletins describing billing procedures, rules, and regulations.

15. Medicare reimbursed DME providers and other healthcare providers for medically necessary items and services rendered to beneficiaries. To receive payment from Medicare, providers submitted or caused the submission of claims to Medicare, either directly or through a billing company.

16. A Medicare claim for DME reimbursement was required to set forth, among other information, the beneficiary's name and unique Medicare identification number, the equipment provided to the beneficiary, the date the equipment was provided, the cost of the equipment, and the name and unique physician identification number of the physician who prescribed or ordered the equipment.

17. Medicare would pay a claim for the provision of DME only if the equipment was medically necessary, ordered by a licensed provider, and actually provided to the beneficiary. Medicare claims were required to be properly documented in accordance with Medicare rules and regulations. Medicare would not reimburse providers for claims that were procured through the payment of kickbacks and bribes.

### B. The Conspiracy

18. From in or around January 2018 through in or around October 2018, in the Middle District of Florida, and elsewhere, the defendant,

RENITA BROWN,

did knowingly and willfully combine, conspire, confederate, and agree with McNeal, Harry, Stockett, and others, to commit health care fraud, in violation of 18 U.S.C. § 1347.

### C. Purpose of the Conspiracy

19. The purpose of the scheme was for Renita Brown, McNeal, Harry, Stockett, and others to unlawfully enrich themselves by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare for braces that were medically unnecessary and/or ineligible for Medicare reimbursement; and (b) diverting fraud proceeds for their personal use and benefit, the use and benefit of others, and to further the fraud.

### D. Manner and Means

20. The manner and means by which the defendant and her conspirators sought to accomplish the purposes of the conspiracy included, among others, the following:

    a. It was a part of the conspiracy that Renita Brown would and did falsely certify to Medicare that she would comply with all Medicare rules and regulations, and federal laws, including that she would not knowingly present or cause to be presented a false and fraudulent claim for payment by Medicare and that she would comply with the Anti-Kickback Statute.

b. It was further a part of the conspiracy that Renita Brown would and did work directly, or indirectly through staffing companies, for various purported telemedicine companies, including Integrated and AffordADoc.

c. It was further a part of the conspiracy that McNeal, Harry, Stockett, and others would and did pay, or cause to be paid, Renita Brown in exchange for signing brace orders.

d. It was further a part of the conspiracy that McNeal, Harry, Stockett, and others would and did pay, or cause to be paid, Renita Brown between $20 and $30 for each purported telemedicine consult she completed.

e. It was further a part of the conspiracy that Renita Brown would and did sign medically unnecessary orders for pre-selected braces for Medicare beneficiaries (a) without seeing, speaking to, and/or otherwise communicating with or examining the Medicare beneficiaries', and (b) without determining the Medicare beneficiaries' need for the braces.

f. It was further a part of the conspiracy that Renita Brown would and did electronically sign orders and other Medicare-required documents for medical braces that contained false and fraudulent statements, including that she had spoken with the Medicare beneficiary, that she had established a valid prescriber-patient relationship with the Medicare beneficiary, that she medically assessed the Medicare beneficiary, and/or that she conducted various examinations and diagnostic tests on the Medicare beneficiary.

g. It was further a part of the conspiracy that between in or about June 2018 and in or about October 2018, Renita Brown would and did cause the submission by durable medical equipment companies of false and fraudulent claims to Medicare for approximately $7,318,227.55 that were medically unnecessary and/or ineligible for reimbursement, of which Medicare paid approximately $3,582,795.09.

All in violation of 18 U.S.C. § 1349.

## FORFEITURE

1. The allegations contained in Count One are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 982(a)(7).

2. Upon conviction of a federal health care conspiracy, in violation of 18 U.S.C. § 1349, the defendant shall forfeit to the United States of America, pursuant to 18 U.S.C. § 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of the offenses.

3. The property to be forfeited includes, but is not limited to, an order of forfeiture in the amount of at least $171,216, which is the amount the defendant obtained as a result of the commission of the offense.

4. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property under the provisions of 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).

ROGER B. HANDBERG
United States Attorney

*Lorinda I. Laryea/cw*
LORINDA I. LARYEA
Acting Chief, Fraud Section
U.S. Department of Justice

*Cath W.*
CATHERINE WAGNER
Trial Attorney
Florida Special Bar No. A5502410
Fraud Section, Criminal Division
U.S. Department of Justice
1000 Louisiana, St. 2300
Houston, Texas 77002
Catherine.wagner@usdoj.gov
(713) 567-9515